IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION (CLEVELAND)

| | | |
|---|---|---|
| KELLIE A. SLUSHER | ) | CASE NO. |
| 15127 WOODSONG DRIVE | ) | |
| MIDDLEFIELD, OH 44062 | ) | |
| | ) | JUDGE |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | **(TRIAL BY JURY DEMANDED)** |
| UNIVERSITY HOSPITALS | ) | |
| GEAUGA MEDICAL CENTER | ) | |
| 13207 RAVENNA ROAD | ) | |
| CHARDON, OH 44024 | ) | |
| | ) | |
| Defendant. | ) | |

Now comes Plaintiff, Kellie A. Slusher, and for her Complaint against University

Hospitals Geauga Medical Center states as follows:

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331, 1337, 1343, 2201 and 2202.  This suit seeks recovery for discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000 et seq., ("Title VII") and Ohio Revised Code 4112 *et seq*.  This action is brought to remedy discrimination and retaliation on the basis of sex, including pregnancy, in the terms, conditions, and privileges of Plaintiff's employment and remedy retaliation against her for activity protected under Title VII and Ohio Revised Code 4112.01 *et seq*. Injunctive and declaratory relief, damages and other appropriate legal and equitable relief are sought pursuant to 42 U.S.C. §2000 (f) and (g).   Plaintiff states that on November 12, 2010 she filed an EEOC intake questionnaire initiating a charge of discrimination based on sex, preganancy and retaliation against Defendant.  That charge was filed with the EEOC on or about February 15, 2011.  On February 28, 2011, the EEOC issued Plaintiff a right to sue letter. (Ex. A)  This Court's supplemental jurisdiction is also invoked pursuant to 28 U.S.C. 1367 over State statutory claims and common law claims for discrimination based on sex, pregnancy, retaliation and invasion of privacy.

2. Slusher has complied with all the prerequisites to jurisdiction in this Court under Title VII.  Jurisdiction of the Court is proper under §706(f)(3) of Title VII, §42 U.S.C. §2000(e-5)(f)(3).

3. As the unlawful employment practices complained of herein occurred within the Northern District of Ohio, venue is proper in this District pursuant to §706(f)(3) of Title VII, 42 U.S.C. §2000(e-5)(f)(3).

## PARTIES

4. Plaintiff Kellie A. Slusher (hereinafter "Slusher") is a citizen of the United States residing at 15127 Woodsong Drive, Middlefield, Ohio, 44062.

5. Defendant, University Hospitals Geauga Medical Center is a medical care facility having its principal place of business at 13207 Ravenna Road, Chardon, OH, 44024.

6. University Hospitals Geauga Medical Center employed Slusher as a registered nurse.  Her employment began on or about July 2008.

## PRELIMINARY STATEMENT

7. Slusher brings this action for damages for an unlawful termination of her employment.  Slusher alleges that in terminating her, the Defendant did so in violation of Title VII, O.R.C. §4112.01.  Slusher states that Defendant also unlawfully invaded her privacy by accessing her private medical records. Specifically,  Defendant University Hospitals Geauga Medical Center discriminated against Plaintiff on the basis of her sex because she was subjected to a hostile work environment involving continuous sexual harassment.  She was discriminated and retaliated against because of her sex when she refused sexual advances of the Chief Medical Office at University Hospitals Geauga Medical Center.  This discrimination based on her sex, included her pregnancy, when within weeks of Slusher's return from maternity leave, she complained about the harassment and she was terminated.

## FACTUAL ALLEGATIONS

8.  Slusher was hired by University Hospitals in July 2008 as a registered nurse at the Geauga Medical Center.  She met the Chief Medical Officer, Dr. Donald Goddard (hereinafter "Goddard") while employed as a registered nurse.  On occasion, Slusher met co-workers out for drinks after work.  Once Slusher started working at Geauga Medical Center, Goddard began to join them for drinks after work.  Prior to Slusher's employment, her colleagues noted that Goddard had not previously attended after work socials with them.  Slusher also saw Goddard at the YMCA.  At this time, Slusher was enrolled in the Nurse Practitioner Program at August Peay State University, Clarksville, Tennessee.  Slusher and Goddard talked about her program during the time the two of them performed rounds.  Goddard offered to Slusher "you know I am an instructor at Case and I could help you out with that."  This occurred in August/September of 2008.  Goddard became Slusher's preceptor for her nurse practitioner certification in October 2008.

9.  In November 2008, Slusher and Goddard's relationship became personal.  They started dating.  By January 2009, the relationship had become sexual.  Goddard started talking about marriage.  He proposed sharing bank accounts.  Goddard invited Slusher to move in with him.  However, she declined.  Between January and March 2009, Slusher was transferred into the job of care coordination, monitoring patient outcomes.  During this time, Goddard continued to be her preceptor for her nurse practitioner courses and clinical exercises.  Their personal

relationship continued and Goddard frequently texted her before she got out of bed in the morning.

10. In March 2009, Slusher's father had transplant surgery.  She spent the vast majority of her time at the hospital.  Goddard did not adjust well to this situation.  Slusher felt that he was becoming more and more possessive.  For example he stared at her while she was at the gym, he drove through her housing complex at odd hours, and moved into an apartment in Burton, closer to Slusher's residence in Middlefield.  On several occasions, Goddard verbalized that he would be proud to be her husband.   However, Slusher did not want to get married.  By the end of March 2009, Slusher was having second thoughts about the relationship.

11. Slusher did not like the direction this relationship was heading.  She felt that Goddard grew more possessive and more disturbed when she was not at his beck and call.  She informed Goddard that "I don't know if this is going to work".  Slusher quit talking to Goddard.  However, Goddard continued calling her on her cell phone or at work, email or texting saying "I miss you, can we work this out?"

12. Slusher was still working as a registered nurse performing her job duties at University Hospitals Geauga Medical Center.  It seemed that Goddard always showed up when she was on duty.  Several of Slusher's co-workers noted "that's crazy, he's always showing up when you are here, Kellie."  Goddard texted Slusher throughout the day.  If Slusher did not answer the text, then Goddard would show up on the floor or he would call the floor asking for her to be paged.

13. By June 2009, Slusher had ended the personal relationship with Goddard.  Around this time, Slusher reconciled with her ex-husband.  Slusher reiterated to Goddard that she did not want a personal relationship with him any longer.

14. Through June and July, Slusher stopped talking to Goddard.  Goddard became more and more disturbed by the lack of communication from Slusher.  He constantly texted and emailed Slusher in an attempt to restart the personal relationship.  In July 2009, Slusher went on vacation to Myrtle Beach with her family.  She and Goddard planned the vacation back in January 2009.  Even though Slusher and Goddard had broken up by July 2009, Goddard still went through with his vacation plans with his girls at a different house at Myrtle Beach.  Goddard and his family stayed 20 miles from Slusher.  Nonetheless, Goddard came to Slusher's beach, 20 miles away from where he was staying.

15. During this time, Slusher was afraid for her job.  Goddard continued to be her preceptor for two semesters.  He oversaw two adult health clinics with her.  During this time in the summer of 2009, even though Slusher had stopped the personal relationship with Goddard, he still texted and paged Slusher throughout the hospital.  Goddard  asked her questions about work but he did not ask such questions of other care coordinators.  Goddard still came around on Slusher's rounds but not with any of the other nurses or care coordinators.

16. Around July 30, 2009, Slusher found out that she was pregnant.  The father of the child is Lynn Slusher, the ex-husband whom Slusher had reconciled with as of June 2009.

17. Slusher told Chris Young, (hereinafter "Young"), Slusher's Nurse Manager, that she was pregnant.  Slusher told Young she did not want Goddard to know about the pregnancy because of his unpredictable reaction.  Young, however, told the Director of Nursing, Peggy Kuhar, (hereinafter, "Kuhar") that Slusher was pregnant.  Shortly after that, Slusher began receiving texts and emails in August and September 2009, from Goddard stating "I heard rumors that you are pregnant."

18. Slusher confronted Goddard and asked how he knew.  Goddard admitted that Kuhar told him she felt that he needed to know that Slusher was pregnant.  Goddard attempted to rekindle the personal relationship between him and Slusher with the offer "You don't have to work, you can work part-time, I will raise the baby as my own.  We can get a big house."  Slusher declined as best she could in order to keep his emotional reaction level and to avoid any retaliation from him.  Throughout September, Goddard made several more offers to restart their personal relationship, but Slusher declined.

19. At the end of September 2009, concerned that Goddard was accessing  her medical records, Slusher learned that, without her permission, and without ever having established any type of doctor-patient relationship, Goddard had accessed her medical records.

20. Slusher again confronted Goddard asking him "Why did you access my records?  You have never been my physician and you have never had my permission."  Goddard responded "I just wanted to see if it were true.  Are you threatening me?  Because if you are threatening me, then …"  Goddard did not finish his threat, but

he impressed upon Slusher the message that he would retaliate if she reported the breach of privacy.

21. Slusher approached Kuhar and other University Hospitals Geauga Medical Center personnel stating that she was not comfortable with the fact that Goddard had accessed her private medical records. She also told multiple managers and supervisors at University Hospitals Geauga Medical Center that Goddard continued to come on her rounds which bothered her and upset her. Young asked Slusher to just let it go. Goddard said to Slusher "Please don't get Kuhar into trouble …"

22. At this time, September to October 2009, Slusher applied for positions at University Hospitals Ahuja Medical Center and one position in downtown Cleveland. She was passed over for both positions. She applied for three or four other positions. She wanted a new assignment at another University Hospitals facility to escape the harassment and the hostile environment at the University Hospitals Geauga Medical Center.

23. During this time, Goddard remained Slusher's preceptor and sponsored her for her clinical hours despite her attempts to change sponsors.

24. Goddard talked to Steve Jones, (hereinafter "Jones") Chief Financial Officer/President of University Hospitals Geauga Medical Center. Goddard related to Slusher that he talked to Jones about having her develop Geauga Medical Center's Nurse Practitioner Program. Goddard told Slusher that he and Jones were waiting for her to complete the certification program, graduate in May 2010, take her test in June and be ready to develop a new program at University

Hospital Geauga Medical Center with Slusher as the director of this yet to be formed nurse practioner practice at University Hospitals Geauga Medical Center.

25. In order for Slusher to complete her Nurse Practitioner Program, she had to complete 240 clinical hours.  Due to her pregnancy and maternity leave, Slusher was going to be 30 hours short.  Goddard suggested that he sign off on the hours and that Slusher could make them up over the summertime.  This would keep her on track to take the nurse practitioner test in June 2010 and start heading up the nurse practitioner program at University Hospitals Geauga Medical Center in July.  On or about March 9, 2010, Goddard signed a bunch of blank forms.  Slusher and Goddard were talking about seeing patients as a nurse practitioner after she completed the program and Goddard emphasized that she could make up the hours that she was short with him over summer 2010.  Slusher suggested that in order for her to complete those clinical hours that she see patients under the supervision of other doctors including Drs. Razz and Evans.  However, that suggestion was rejected by University Hospitals Geauga Medical Center indicating that other individuals were coordinating the patients with Dr. Razz.

26. On March 22, 2010, Slusher gave birth.  Goddard noted that his contract was going to change and that she would be able to see patients with him in the nursing homes over the summertime.

27. In May 2010, Slusher graduated from the nurse practitioner program.  In June 2010, she took the nurse practitioner certification test and passed.

28. On June 7, 2010, Slusher returned from maternity leave.  The first day back from maternity leave, Goddard came to rounds with Slusher.  Slusher's colleagues

9

teased her.  Her colleagues stated "Goddard hasn't been on rounds in awhile."
One day, Goddard called from his cell phone, paged Slusher over the speaker
system and asked her a completely irrelevant question.  Slusher hung up the
phone and out of exasperation said loudly "I wish he would quit calling me."
Right behind her was Dr. DiMarco, who heard her.  A week later, the Ohio State
Nursing Board called Slusher inquiring about clinical hours that had not been
actually worked by her.  Goddard had called the Nursing Board and alleged that
Slusher had falsified 30 clinical hours toward the completion of her nurse
practioner program.

29. Goddard also informed University Hospitals legal and human resources.  The
Director of Nursing at University Hospitals Geauga Medical Center, Peggy
Kuhar, called Slusher into the office.  Together, Kuhar and Slusher called the
nurse practitioner school through which she earned her certification.  Austin
Peay's representative, Leann Busby (hereinafter "Busby"), informed Kuhar that
Goddard had also called them.

30. Kuhar, Busby and Slusher all discussed the situation.  Kuhar and Busby asked
Slusher why Goddard called the school and the State Nursing Board?  Slusher
told them "I think he's doing this retaliating against me for denying his sexual
advances."   Slusher stated because he retaliated against her because "I wouldn't
date him, I wouldn't restart the relationship, and I was warding off his advances."
Kuhar and Busby also asked about the short clinical hours.  Slusher told them that
Goddard suggested that I could make the 30 clinical hours with him over the
summertime.  However, Slusher afraid of Goddard's unpredictable behavior had

10

already arranged to complete her clinical hour requirements with another physician, Dr. Rodway.

31. University Hospitals Geauga Medical Center further investigated.  A couple weeks later, Slusher was called into the law department for an interview.  The Legal and the Human Resources Department met with Slusher telling her that she was being terminated.  Slusher objected and complained that this was an unfair termination.  Slusher told Human Resources that she felt she was being retaliated against by Goddard because she would not date him.  Slusher related to Human Resources the hostile environment that Goddard created for her.  She told Human Resources about his sexual advances the retaliation.  Kuhar who was present at this meeting confirmed saying "Yes, she did."

32. On September 9, 2010, University Hospitals Geauga Medical Center upheld Slusher's termination. Slusher appealed the termination pursuant to University Hospitals' policies and procedures.  The Step 1 appeal was denied and the termination was upheld.  Slusher again appealed to Step 2 according to University Hospitals' internal policies and procedures.  University Hospitals never conducted a Step 2 hearing.

33. Slusher initiated a charge of discrimination on or about November 12, 2010.

34. On or about February 28, 2011, the EEOC issued Slusher a right to sue letter.


## FIRST CAUSE OF ACTION
### (Title VII Sex Discrimination: Hostile Environment, Quid Pro Quo, Pregnancy)

35. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 34 of this Complaint with the same force and effect as if set forth herein.

36. Defendant has discriminated against Plaintiff in the terms and conditions of her employment on the basis of sex including her pregnancy by creating a hostile work environment and *quid pro quo* conditions of her employment in violation of her employment in violation of Title VII.

37. Plaintiff is now suffering and will continue to suffer irrevocable injury and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

## SECOND CAUSE OF ACTION
### (Title VII Retaliation)

38. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 37 of this Complaint with the same force and effect as if set forth herein.

39. Defendant has retaliated against Plaintiff and has denied her opportunities for employment on the basis of her sex including pregnancy and for having complained of discrimination in violation of Title VII.  Plaintiff is now suffering and will continue to suffer irrevocable injury and monetary damages as a result of defendant's retaliatory practice unless and until this Court grants relief.

## THIRD CAUSE OF ACTION
### (Ohio Revised Code Section4112.02(A))

40. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 39 of this Complaint with the same force and effect as if set forth herein.

The above act and practices of Defendant constitute unlawful discriminatory employment practices within the meaning of Ohio Revised Code §4112.01 *et seq*. O.R.C. §4112.02(a) makes it unlawful discriminatory practice "For any employer, because of race, color, religion, sex, national origin, disability, age or ancestry of any person to discharge without cause, to refuse to hire or otherwise discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

41. Plaintiff states she is and was at the time of her termination a member of protected class, as defined under ORC §4112.02(A), as a female.  Plaintiff states that she was subjected to sexual harassment while employed by Defendant.  Plaintiff states that she established a violation of ORC §4112.02(A) due to "*quid pro quo* harassment".

42. Plaintiff states that she has established a violation of ORC §4112.02(A) due to "hostile environment" harassment.

43. Plaintiff states that she has suffered economic and compensatory damages, and has experienced pain, suffering, and embarrassment as a result of the discriminatory practices she endured while employed at Defendant.

### FOURTH CAUSE OF ACTION
### (Ohio Revised Code Section 4112.02(I))

44.  Plaintiff realleges the prior paragraphs as if fully set forth below.

45. O.R.C. §4112.02(I) makes it unlawful "for any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a

13

charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing …"

46. Plaintiff states that she is, and was at the time of her termination, a member of a protected class, as defined by O.R.C. §4112.02(A), as a female.

47. Plaintiff states that she was subjected to retaliation for reporting sexual harassment while employed by Defendant.

48. Plaintiff states that she has established a violation of O.R.C. 4112.02(I).  Plaintiff states that she has suffered economic compensatory damages, and has experienced pain, suffering, and embarrassment as a result of the discriminatory practices she endured while employed at Defendant.

## FIFTH CAUSE OF ACTION
### (Wrongful Termination Ohio Revised Code §4112.99)

49. Plaintiff realleges the prior paragraphs 1 through 48 as if fully set forth below.

50. Plaintiff states her claim for relief under O.R.C. §4112.99 is commenced within two years of the harassment she endured while employed by University Hospitals.

51. Plaintiff alleges that Defendant University Hospitals discriminated against her in violation of O.R.C. §4112.02(A) and (I) and is entitled to bring this action under O.R.C. §4112.02(A) and (I).  Plaintiff alleges Defendant University Hospital discriminated against her based on her sex and in violation of O.R.C. §4112.02(A) and (I).  This discriminatory action constitutes a violation of O.R.C. §4112.02(A) and (I).  Under O.R.C. §4112.99, the Plaintiff is entitled to damages, injunctive relief and any other relief this Court finds appropriate.

## SIXTH CAUSE OF ACTION
### (Common Law Tort – Invasion of Privacy)

52.  Plaintiff incorporates each and every allegation contained in Paragraphs 1 through 51 of this Complaint as if fully restated herein.

53. Plaintiff states that during her employment with Defendant that Defendant's employees illegally accessed her private medical information without permission and without a privileged relationship causing humiliation.  This invasion of privacy of sensitive facts is and would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.  The matter herein disclosed was not a legitimate concern to the public nor to Goddard when he accessed Slusher's private medical records to determine whether or not rumors of her pregnancy were indeed true.  Goddard had no existing physician patient relationship with Slusher and yet he abused his position as the Chief Medical Officer of University Hospitals Geauga Medical Center to access a patient's private medical records.

54. As a proximate result of the actions of Defendant as complained of herein, Plaintiff has suffered great mental and emotional stress, anxiety, humiliation and embarrassment all to her damage.  Plaintiff has been forced to incur litigation expenses and attorney's fees.

**WHEREFORE**, Plaintiff prays for reinstatement plus back pay and lost fringe benefits together with all raises to which she would have been entitled or in the alternative for front pay in lieu of reinstatement.  Plaintiff further demands a judgment against Defendant for compensatory and punitive damages for emotional distress, anxiety, humiliation, embarrassment plus her costs, interests and reasonable attorney's fees.  Plaintiff also seeks an amount of liquidated

damages equal to her damages and her costs and attorney's fees all together with prejudgment and post-judgment interest.  Plaintiff requests damages in total exceeding $5,000,000.  Plaintiff prays for whatever other legal or equitable relief to which she may appear to be entitled.

Respectfully submitted,

s/Jonathan A. Good
_____
Jonathan A. Good (0065649)
Christine Fallon Good (0055560)
Good & Good LLC
Standard Building
1370 Ontario St., Suite 1210
Cleveland, Ohio 44113
Phone: (216) 575-1900
Fax: (877) 450-7810
jgood@goodlawllc.com
cgood@goodlawllc.com

## JURY DEMAND

Plaintiff demands a jury trial as to all issues so triable in the within cause.

s/Jonathan A. Good
_____
Jonathan A. Good (0065649)